1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

CHAD WAYNE HURN,

8                                    Petitioner,          Case No. C19-1942-RAJ-MAT

9              v.

10                                                        REPORT AND RECOMMENDATION

RONALD HAYNES,

11                                    Respondent.

12

13                  INTRODUCTION AND SUMMARY CONCLUSION

14        Petitioner Chad Hurn is a Washington prisoner who is currently confined at the Stafford

15   Creek Corrections Center in Aberdeen, Washington.  He seeks relief under 28 U.S.C. § 2254 from

16   a 2014 King County Superior Court judgment and sentence.  Respondent has filed an answer and

17   a supplemental answer responding to petitioner's federal habeas claims and has submitted relevant

18   portions of the state court record.  Petitioner has filed a response to respondent's answer and

19   respondent, at the Court's direction, filed a reply to petitioner's response.  Petitioner has also filed

20   a motion seeking to expand the record before this Court which respondent opposes.  This Court,

21   having carefully reviewed petitioner's petition for writ of habeas corpus, all briefing of the parties,

22   the state court record, and petitioner's motion to expand the record, concludes that petitioner's

23   petition and his motion to expand the record should be denied, and that this action should be

REPORT AND RECOMMENDATION
PAGE - 1

1  dismissed with prejudice.

2                          FACTUAL BACKGROUND

3       The Washington Court of Appeals, on direct appeal, summarized the facts underlying

4  petitioner's convictions as follows:

5          On February 19, 2013, just after 1:00 a.m., 20-year-old Karla Barnhardt
6       accepted a ride from a friend to deliver her ex-boyfriend's belongings to his new
         residence and obtain heroin from him.  When she was dropped off, Barnhardt
7       realized that she had the wrong address.  Her friend, who was rushing for a ferry,
         declined to take her to the correct location.  Stranded with bags containing her ex-
8       boyfriend's belongings, Barnhardt called Hurn for help.

9          Hurn, 35 years old, lived nearby and arrived about five minutes later with a
         girl who was approximately 15 years old, later identified as B.B.  Hurn was driving
10      a silver, two-door Acura with a sunroof, which Barnhardt had never seen before.
         He usually drove a red Jeep Cherokee.  Barnhardt loaded her bags into the car and
11      sat down.  When she told Hurn that she did not want to go home but, rather, to her
         ex-boyfriend's home, Hurn demanded money for the ride.  Barnhardt had no money
12      but indicated that her friend would pay him.  Hurn nevertheless refused to give her
         a ride.  Although Barnhardt begged not [to] be stranded in the middle of the night,
13      Hurn told her to "get the fuck out of the car" and started throwing her bags out of
         the car.  As Barnhardt was trying to get her things together to exit the car, Hurn
14      pulled out a gun, said "I'm not fucking around," and shot the gun through the open
         sunroof.  Terrified, Barnhardt rushed out of the car, which then sped off.

15         Barnhardt sat on the sidewalk, sobbing loudly.  A neighbor was awakened
16      by the gunshot and Barnhardt's crying and called 911.  Police responded within a
         few minutes.

17         Officer Taralee San Miguel[1] arrived at the scene and observed Barnhardt
18      sitting on the curb with several large bags, looking distraught.  Barnhardt identified
         herself as "Destiny Coral" and initially denied hearing or having anything to do
19      with a shot being fired.  Barnhardt never gave San Miguel her true name but did
         eventually report what had happened with Hurn and the gunshot.  San Miguel
20      collected a single shell casing from the middle of the road.

21         Barnhardt entered the police vehicle and San Miguel, with Barnhardt's
         assistance, located Hurn's apartment complex.  San Miguel broadcast the address
22      over the radio.  Officer Brett Willet responded to the address and encountered Hurn

23      _____
            [1] [Court of Appeals footnote 3] At the time of the incident, Officer San Miguel was known as Officer
         Mabry.

REPORT AND RECOMMENDATION
PAGE - 2

near a silver Acura and red Jeep Cherokee.  San Miguel brought Barnhardt to the scene, and Barnhardt positively identified Hurn.

Willet arrested Hurn.  During the arrest, Hurn asked Willet to retrieve from his wallet a piece of paper entitled "Notice to Arresting Officer With Miranda Warning."  The document purported to identify its bearer as a "Civil Rights Investigator" who "does not waive any of his rights, including the right to personal time and property, at any time."  Hurn insisted the officer sign the document as the "Belligerent Claimant."  Officers present at the scene of the arrest were confused as to the meaning of the document but concluded that it was not an invocation of the right to counsel or the right to silence.

Willet fully advised Hurn of his <u>Miranda</u> rights.  Hurn stated that he understood his rights and did not ask for counsel or articulate a preference to remain silent.  Willet did not question Hurn substantively at the scene but, instead, drove him to the precinct.

At the precinct, Willet inventoried Hurn's belongings while Hurn was in a holding cell five or six feet away.  Hurn was able to see and hear the officer from his cell.  In Hurn's wallet, Willet found an IRS tax refund check in the amount of $3,526 made out to Alexander Gregory.  When Willet showed the check to Officer Heller, Hurn exclaimed, "I found that!"

The investigation continued with warrant-authorized searches of Hurn's home, the silver Acura, and Hurn's property at the jail.  In a laptop case at Hurn's home, detectives located a silver .25 caliber pistol, which was later found to have fired the casing that San Miguel found near Barnhardt.  Detectives learned that the pistol had been reported stolen along with the blue Jeep Wrangler in whch it had been stored by its owner.  Detectives also discovered a number of forged Washington State identification cards, some bearing Hurn's photo with other names printed thereon and others bearing a photo of 15-year-old B.B. with other names set forth.  One of the forged driver's licenses with Hurn's picture had the name Alexander Gregory; another had the name Igor Zanine.  Additionally, detectives found a Social Security card and driver's license in the name of Lance Elliott.  In the silver Acura, which police determined had been stolen from Adhanom Legesse, police found a bag of stolen mail addressed to 25 different people including Gregory and Legesse, several loose license plates, a stolen checkbook in the name of Dustin Gentry, and multiple shaved keys of a type used for auto theft.

Detectives eventually located 15-year-old B.B., who said she was with Hurn when he stole the Acura, the blue Jeep, a blue Subaru, and other cars.  B.B. stated that Hurn used shaved "jiggler" keys to access the cars and swapped license plates on the stolen cars to avoid detection.  B.B. stated that she and Hurn also stole mail from mailboxes and recalled that Hurn was excited to cash a stolen IRS check.  B.B. also described going to a Verizon store with Hurn, where they presented forged ID cards in obtaining a service contract in the name of Igor Zanine, two iPhones, and

REPORT AND RECOMMENDATION
PAGE - 3

1    a mobile hotspot ("Jetpack").

2        B.B. described her relationship with Hurn. She had met him while trying
3    to buy methamphetamines. The two began to spend time and use drugs together
     almost every day. Although Hurn was a married man in his thirties and knew that
4    B.B. was only 15, he frequently made sexual comments to her, rubbed her thigh
     while he gave her driving lessons, and had once bitten one of her buttocks. He was
5    angry when he found out that B.B. had a boyfriend. As with Barnhardt, Hurn
     threatened B.B. when he was angry. B.B. later recounted, "[h]e threatened to shoot
6    me, he threatened to kill me, he threatened my life multiple times. He showed up
     at my window and I opened the window and there was a gun in my face." He also
7    hit her.

8        At trial, Legesse testified that his 1997 two-door Acura was stolen in
     February 2013. Police recovered the car two months later. Different license plates
9    had been mounted on the car, which also contained property that had not been there
     when it was stolen, including an orange safety vest, loose license plates, a
10   checkbook, a knife, a gun holster, credit cards, a Verizon Jetpack, a bag of mail
     belonging to others, a set of shaved keys, and items associated with Alexander
11   Gregory.

12       Lance Elliott testified at trial that he had given Hurn his driver's license,
     Social Security card, and bank statements when hiring Hurn's "Rent-a-Pad"
13   apartment locating service. When detectives searched Hurn's home, they found a
     forged driver's license and Social Security card in Elliott's name.

14       Igor Zanine also testified at trial. He did not know Hurn and had not given
     him permission to use his identity. Police found a forged driver's license and Social
15   Security card in Zanine's name in the laptop case in Hurn's apartment. Hurn had
     utilized these documents to open a Verizon cell phone account.

16
17       Joey Otten testified that her blue Jeep Wrangler was stolen in February
     2013. Otten kept her .25 caliber pistol in a locked gun safe in the Wrangler. She
18   testified that when she recovered the Wrangler, the console box had been damaged
     and the lock destroyed. Detectives found Otten's pistol in the search of Hurn's
19   home and confirmed that it was the gun that Hurn had shot out of the Acura's
     sunroof. A partial palm print lifted from inside the Wrangler was a positive match
20   for Hurn.

21       Dustin Gentry's blue Subaru Impreza was also stolen in Februray 2013.
     Gentry's checkbook was in the car when it was stolen. This checkbook was later
22   found in the silver Acura. A check from the book had been made out to Rebecca
     Fisher, the name on one of the forged driver's licenses bearing B.B.'s picture.

23       By amended information, the State charged Hurn with assault in the second

REPORT AND RECOMMENDATION
PAGE - 4

degree, unlawful possession of a firearm in the first degree, possessing a stolen firearm, three counts of possession of a stolen vehicle (PSV), making or having vehicle theft tools, three counts of identity theft in the second degree, tampering with a witness, communication with a minor for immoral purposes (CMIP), and intimidating a witness.  Before trial, Hurn moved to sever the counts into three "clusters" of charges to be tried in three separate trials.  The State opposed severance.  The trial court denied the motion.  Hurn renewed his motion to sever during trial, and the trial court adhered to its ruling.

One of Hurn's fellow inmates, Jaylyn Johnson, testified at trial that Hurn asked for his assistance in ensuring that B.B. did not show up for trial.  Hurn, who was acquainted with Johnson's uncle, said to Johnson, "I need a girl . . . to not show up to court for trial. . . . I know your uncle knows a lot of different ways. . . . [H]e could drug her or just whatever, just make sure she does not show up to court."  Hurn also told Johnson that he "ha[d] a lot of people on the outside" and, if B.B. participated in the trial and he was convicted, "she'd not be walking around."  Johnson interpreted this to mean that B.B. "would be . . . dead, killed."  Johnson, who knew B.B. through a girlfriend, warned her about Hurn's threats and also reported the threats to a detective he trusted.

A jury found Hurn guilty as charged and found that Hurn was armed with a firearm while committing the second degree assault.  The trial court imposed an exceptional sentence totaling 252 months, including the mandatory 36-month firearm enhancement.

(Dkt. 14, Ex. 2 at 1-7.)

PROCEDURAL BACKGROUND

Petitioner appealed his convictions to the Washington Court of Appeals.  (*Id*., Ex. 3.) Petitioner's appellate counsel identified the following five assignments of error in petitioner's opening brief on appeal: (1) the trial court erred in admitting other-acts evidence contrary to the requirements of ER 404(b); (2) the trial court erred in denying petitioner's motion to sever the charges against him; (3) there was insufficient evidence to support the jury's verdict on the second-degree assault charge; and, (4) petitioner's right to counsel was violated when he was interrogated after he was arrested because he had previously invoked his right to counsel.  (*See id*.)

Petitioner also filed a *pro se* statement of additional grounds for review in which he

REPORT AND RECOMMENDATION
PAGE - 5

1    identified the following four issues: (1) the trial court erred in allowing the testimony of a latent

2    fingerprint examiner; (2) the trial court abused its discretion by denying petitioner a *Franks*

3    hearing; (3) the trial court denied petitioner his right to confrontation when it limited the cross-

4    examination of a key prosecution witness; and, (4) the trial court erred by refusing to give three

5    lesser included offense instructions.  (*See id*., Ex. 4.)

6        On December 7, 2015, the Court of Appeals issued an unpublished opinion affirming

7    petitioner's convictions.  (*Id*., Ex. 2.)  Petitioner thereafter filed a motion for reconsideration

8    pertaining only to the admission of some of the ER 404(b) evidence, and that motion was denied

9    on January 5, 2016.  (*Id*., Exs. 7, 8.)

10        Petitioner next sought discretionary review by the Washington Supreme Court.  (*Id*., Ex.

11    9.)  Petitioner identified the following seven issues in his petition for review: (1) the trial court

12    erred in admitting other-acts evidence contrary to the requirements of ER 404(b); (2) the trial court

13    erred in denying petitioner's motion to sever the charges against him; (3) there was insufficient

14    evidence to support the jury's verdict on the second-degree assault charge; (4) petitioner's right to

15    counsel was violated when he was interrogated after he was arrested because he had previously

16    invoked his right to counsel; (5) the trial court erred by refusing to give lesser included offense

17    instructions; (6) the trial court erred in denying petitioner a *Franks* hearing; and, (7) the trial court

18    denied petitioner his right to confront witnesses.  (*See id*.)

19        The Supreme Court issued an order denying review without comment on June 29, 2016.

20    (*Id*., Ex. 10.)  The Court of Appeals issued a mandate terminating direct review on September 23,

21    2016.  *See* http: //dw.courts.wa.gov (follow "Case Search Options" hyperlink; then go to

22    "Appellate Court Cases" tab; then follow "Appellate Case Number Search" hyperlink; then search

23    "Court Name:  COA, Division I" and "Case Number: 718134").

REPORT AND RECOMMENDATION
PAGE - 6

On January 9, 2017, petitioner filed a personal restraint petition in the Washington Court of Appeals in which he asserted the following claims: (1) his rights under the state and federal constitutions were violated when the trial court failed to suppress the testimony of B.B., a victim of three of the charges, because her identity was discovered through an unlawful search of petitioner's cell phone; (2) his federal constitutional right to a fair trial was violated when the state failed to disclose evidence favorable to him and when the police testified falsely at the 3.5/3.6 hearing; and (3) he was denied his constitutional right to effective assistance of counsel. (*Id*., Ex. 11 at 10, 14, 29.) On April 11, 2018, the Acting Chief Judge of the Court of Appeals issued an order dismissing the petition. (*Id*., Ex. 14.)

Petitioner next filed a motion for discretionary review in the Washington Supreme Court in which he asserted that the Court of Appeals erred when: (1) it dismissed his petition without referring it to a panel of judges; (2) it concluded that B.B.'s identity and location were obtained by means independent of the illegal search of petitioner's cell phones and that the unlawful search did not subject B.B.'s testimony to the exclusionary rule; (3) it placed the burden on him to show that video evidence was unlawfully destroyed by the Seattle police in the face of a timely discovery request; (4) it dismissed his *Brady* claim; and (5) it based its decision on facts that were either unsupported and/or directly contravened the record. (*Id*., Ex. 15 at 1-2.) The Supreme Court Commissioner issued a ruling denying review on February 21, 2019. (*Id*., Ex. 16.) Petitioner thereafter moved to modify the Commissioner's ruling, but that motion was denied on May 1, 2019. (*Id*., Exs. 17, 18.) Petitioner now seeks federal habeas review of his convictions.

<u>GROUNDS FOR RELIEF</u>

Petitioner identifies the following ten grounds for relief in his petition:

A. Evidence was Obtained and Introduced Against Petitioner After He Invoked

REPORT AND RECOMMENDATION
PAGE - 7

His Right to Silence and Counsel, in Violation of the Fifth and Fourteenth Amendments to the United States Constitution.

B.  Petitioner's Right to a Fair Trial as Guaranteed Under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution was Violated When The State Failed to Disclose Favorable Impeachment Evidence that Was in the Possession of Investigative Agencies.

C.  The State Destroyed Favorable Evidence in Bad Faith, Violating Petitioner's Due Process and Right to A Fair Trial as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

D.  Petitioner's Right to Due Process and a Fair Trial as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution was Violated When the State Knowingly Used Perjured Testimony During Petitioner's Suppression Hearing.

E.  Petitioner was Denied His Sixth Amendment Right to Effective Assistance of Counsel When His Attorney Failed to Move to Suppress Evidence and Testimony That Was Obtained From an Unlawful Search of his Cellphone and Subject to Exclusion.

F.  The Trial Court Denied Petitioner His Right To Confront and Cross-Examine a Witness Violating the Confrontation Clause of the Sixth Amendment and Denying Petitioner a Fair Trial Under the Sixth and Fourteenth Amendments to the United States Constitution.

G.  The Trial Court's Admission of "Other Bad Acts" Evidence Was So Prejudicial That it Denied Petitioner A Fundamentally Fair Trial as Guaranteed by the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

H.  The Trial Court's Refusal to Sever Charges Denied Petitioner a Fundamentally Fair Trial in Violation of the Due Process Clauses of the Fifth and Fourteenth Amendments.

I.  The State Did Not Prove Petitioner Committed the Necessary Elements of Assault in the Second Degree Violating Petitioner's Right to Due Process Under the Fourteenth Amendment to the United States Constitution.

J.  The Trial Court's Refusal To Instruct The Jury On Lesser Included and Lesser Degree Offenses Violated Petitioner's Rights Under the Fourteenth Amendment to the United States Constitution.

REPORT AND RECOMMENDATION
PAGE - 8

(Dkt. 3-1 at 19-20 (citations omitted).)

DISCUSSION

Respondent asserts that petitioner properly exhausted some, but not all, of his ten grounds for federal habeas relief. (*See* Dkt. 13 at 15-21.) Specifically, respondent appears to concede that petitioner properly exhausted claims A, B, F, and J, but argues that petitioner failed to properly exhaust claims C, D, E, G, H, and I. (*See id*. at 15-21, 32-33; Dkt. 23 at 9-11.) Respondent further argues that petitioner's unexhausted claims are now procedurally barred and are not cognizable in this federal habeas proceeding. (*Id*. at 21-22.) Finally, respondent argues that petitioner is not entitled to relief in this federal habeas action with respect to any of his exhausted claims. (*See id*. at 22-39; Dkt. 23 at 1-8.)

Exhaustion

The Court begins by addressing respondent's argument that some of petitioner's claims have not been properly exhausted and are therefore not eligible for review in this federal habeas proceeding. A state prisoner is required to exhaust all available state court remedies before seeking a federal writ of habeas corpus. 28 U.S.C. § 2254(b)(1). The exhaustion requirement is a matter of comity, intended to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citations omitted). In order to provide the state courts with the requisite "opportunity" to consider his federal claims, a prisoner must "fairly present" his claims to each appropriate state court for review, including a state supreme court with powers of discretionary review. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

"In order to 'fairly present' an issue to a state court, a petitioner must 'present the substance

REPORT AND RECOMMENDATION
PAGE - 9

of his claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013) (quoting *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009)). *See also Picard*, 404 U.S. at 275-78 (1971) (proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim he raises on habeas by describing the operative facts and federal legal theory on which the claim is based). Claims that are based on the same facts must be separately exhausted if they are supported by distinct constitutional theories. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

General appeals to broad constitutional principles such as due process and the right to a fair trial are insufficient to establish exhaustion. *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). "If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court." *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996). A habeas petitioner who fails to meet a state's procedural requirements for presenting his federal claims deprives the state courts of the opportunity to address those claims in the first instance. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

1.    Claim C:  Destruction of Evidence

Petitioner asserts in his third ground for relief (Claim C) that his right to due process and a fair trial were violated when the state destroyed favorable evidence and that he is entitled to relief under the standards announced in *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *California v. Trombetta*, 467 U.S. 479 (1984). (Dkt. 3-1 at 32-34.) Respondent, in his reply to petitioner's response, argues that any claim arising under the *Youngblood* and *Trombetta* standards has not been properly exhausted because petitioner presented his claim regarding the destruction of

REPORT AND RECOMMENDATION
PAGE - 10

evidence to the Washington Supreme Court as one implicating *Brady v. Maryland*, 373 U.S. 83 (1963).  (*See* Dkt. 23 at 9-11.)  It is true that petitioner did not expressly argue in his motion for discretionary that the destruction of evidence violated the standards announced in *Youngblood* and *Trombetta*.  However, it appears that the Washington Supreme Court did reference the applicable standard in rejecting petitioner's challenge the destruction of the video evidence.

A review of the opinions issued by the Washington Court of Appeals and the Washington Supreme Court in petitioner's personal restraint proceedings reveals that the state courts analyzed petitioner's destruction of the evidence claim together with petitioner's claim that the state failed to disclose favorable evidence in violation of *Brady*.  However, both courts, in their respective opinions, made reference to the element of "bad faith" which is a part of the standard applicable to claims regarding the destruction of, or failure to preserve, evidence and not to *Brady* claims.  Thus, despite the absence of any express reference to *Youngblood* and *Trombetta* in the Court of Appeals' opinion, petitioner's motion for discretionary review, or the ruling of the Supreme Court, this Court nonetheless concludes that petitioner has arguably exhausted the claim and the Court will therefore consider the merits of the claim below.[2]

2.   Claim D:  Use of Perjured Testimony

Petitioner asserts in his fourth ground for federal habeas relief (Claim D) that the state knowingly used perjured testimony at his suppression hearing.  (Dkt. 3-1 at 35-37.)  In particular, petitioner claims that police officers falsely testified at the suppression hearing that they did not

---

[2] Even if the Court were to accept respondent's argument that petitioner's destruction of the evidence claim has not been properly exhausted, that would not preclude this Court from addressing the claim on the merits because petitioner has not established any entitlement to relief with respect to that claim.  *See* 28 U.S.C. § 2254(b)(2) ("an application for writ of habeas may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")

REPORT AND RECOMMENDATION
PAGE - 11

1    speak to petitioner while he was detained in a holding cell at the police precinct which, he

2    maintains, caused the trial court to deny his motion to suppress. (*See id*. at 36.) Respondent argues

3    that petitioner failed to properly exhaust this claim because he failed to present the claim as a

4    federal constitutional violation at every level of state court review. (Dkt. 13 at 17-18.)

5         The record reflects that petitioner, in his personal restraint petition, presented to the

6    Washington Court of Appeals a claim alleging that his constitutional right to a fair trial was

7    violated when police testified falsely at his CrR 3.5/3.6 hearing. (Dkt. 14, Ex. 11 at 14.) This

8    claim was presented in conjunction with petitioner's claims that the state failed to disclose

9    favorable evidence in violation of *Brady*, and that the state destroyed favorable evidence in

10   violation of his due process rights. (*See id*., Ex. 11 at 14-28.) In the body of his claim, petitioner

11   cited to relevant United States Supreme Court case law pertaining to a prosecutor's knowing use

12   of perjured testimony, and argued that the officers who testified at his CrR 3.5 hearing committed

13   perjury when they testified that they had no interaction with petitioner while he was detained in

14   the holding cell at the police precinct and that petitioner did not request counsel or invoke his right

15   to remain silent. (*Id*., Ex. 11 at 19-24.)

16        In his motion for discretionary review, petitioner identified essentially the same claim

17   pertaining to the alleged failure to disclose evidence, the alleged destruction of evidence, and the

18   alleged false testimony of the police at the CrR 3.5/3.6 hearing. (*Id*., Ex. 15 at 13.) However,

19   while petitioner referenced the alleged false testimony in the body of his claim, he did not

20   specifically argue that the state knowingly presented false evidence at the pretrial hearing, he

21   argued only that the state's failure to disclose the OPA report constituted a *Brady* violation and

22   that the holding cell video was withheld or destroyed in bad faith. (*See id*., Ex. 15 at 14-18.)

23        Proper exhaustion requires that a claim be presented at each level of review under the same

REPORT AND RECOMMENDATION
PAGE - 12

legal theory and based on the same operative facts. Petitioner did not expressly do that here. He did, however, state in his motion for discretionary review that he was incorporating by reference "every argument and point of law contained in his PRP and Reply Brief below." (*Id.*, Ex. 15 at 14.) The question is whether this attempt at incorporation by reference satisfies the exhaustion requirement. In *Baldwin*, 541 U.S. at 30-32, the Supreme Court observed that federal habeas corpus law does not require a state court judge to read through lower court opinions or briefing to discover the existence of a federal claim. "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Id.*

In some circumstances, incorporation by reference of a prior court document may satisfy the exhaustion requirement. In *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) (internal citations omitted), the Ninth Circuit explained that fair and full presentation satisfying exhaustion occurs with presentation of a federal constitutional claim "(1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim[.]" In *Insyxiengmay*, the petitioner presented to the state supreme court three federal constitutional claims in an appendix consisting of a full copy of his personal restraint petition, and devoted the body of his motion for discretionary review to the state appellate court's dismissal on the grounds of timeliness. *Id.* Noting that the appendix contained the arguments as to the constitutional claims, the court found clear presentation of those claims as federal issues to the state supreme court. The court distinguished cases involving arguments relying on documents never presented to the higher court. *Id.* at 668-69. *Insyxiengmay*, in the appendix filed in the state supreme court, "presented extensive argument in support of all three claims as well as citations to the requisite authority and

1  to relevant parts of the record." *Id*. at 669.[3]

2       This Court has found exhaustion where a petitioner's motion seeking discretionary review

3  identifies an issue for review and attaches briefs or other documents to the petition that contain the

4  arguments in support of the issue. *See, e.g., Silva v. Holbrook*, No. C16-0378, 2016 WL 8235139

5  at *6 (W.D. Wash. Nov. 2, 2016), *adopted*, 2017 WL 568822 (W.D. Wash. Feb. 13, 2017) (in

6  motion for discretionary review petitioner asserted entitlement to discharge based on "sixteen (16)

7  discrete issues raised in the operative pleadings herein[,]" and attached copies of his personal

8  restraint petition and supplemental petition); *Wiggin v. Miller-Stout*, No. C14-1474, 2015 WL

9  2137319 *7 (W.D. Wash. Mar. 20, 2015) ("[P]etitioner arguably put the Washington Supreme

10 Court on notice of his claims by reasserting them in a summary fashion in his motion for

11 discretionary review and by specifically incorporating into his motion all of the arguments

12 contained in his personal restraint petition."), *adopted*, 2015 WL 2137439 (W.D. Wash. May 6,

13 2015). *See also Miller v. Quinn*, No. 07-35531, 2009 WL 117985 at *1 (9th Cir. Jan. 9, 2009)

14 (finding exhaustion where petition identified a claim, but did not refer to federal constitutional

15 issues, but relevant law addressing federal constitutional issues was discussed extensively in

16 attachments to petition).

17      This case is distinguishable from *Insyxiengmay*, and the other cases cited herein, because

18 petitioner did not attach to his motion for discretionary review the documents referenced in his

19 motion for discretionary review.  The manner in which petitioner presented the issue of the

20 perjured testimony to the Supreme Court suggested that the issue was part and parcel of his *Brady*

21

22      [3] Respondent also argues Washington law does not allow for incorporation by reference.  *See, e.g.*, *State v.
I.N.A.*, 9 Wn. App. 2d 422 (2019) (citing *State v. Gamble*, 168 Wn.2d 161 (2010)).  This Court, however, considers

23 this issue pursuant to *Insyxiengmay* and subsequent case law.

REPORT AND RECOMMENDATION
PAGE - 14

1    claim and suggested no independent legal basis for the claim.  Accordingly, petitioner failed to

2    properly exhaust that claim.

3          3.      Claim E:  Right to Effective Assistance of Counsel

4          Petitioner asserts in his fifth ground for relief (Claim E) that he was denied his right to

5    effective assistance of counsel when his attorney failed to move to suppress the testimony of

6    prosecution witness B.B. on the grounds that the state learned her identity through the unlawful

7    search of his cell phone.  (Dkt. 3-1 at 38-43.)  Respondent argues that petitioner failed to properly

8    exhaust this claim because, though he presented the claim to the Washington Court of Appeals in

9    his personal restraint petition as a federal constitutional violation, he did not present the claim in

10   his motion for discretionary review.  (Dkt. 13 at 20.)  Respondent further argues that petitioner's

11   attempt to incorporate by reference into his motion for discretionary review all issues and

12   arguments presented to the Court of Appeals is also insufficient to meet the exhaustion

13   requirement.  (*See id.*)

14         A review of the Washington Supreme Court Commissioner's ruling denying petitioner's

15   request for discretionary review reveals that the Commissioner acknowledged petitioner's

16   ineffective assistance of counsel claim in ruling on petitioner's related Fourth Amendment claim.

17   Because it appears the Commissioner intended to address petitioner's ineffective assistance of

18   counsel claim in ruling on petitioner's motion for discretionary review, petitioner has arguably

19   exhausted the claim and this Court will therefore consider the merits of the claim below.[4]

20

21          [4] As noted above, even if the claim were to be deemed unexhausted, that would not preclude this Court
     from addressing the claim on the merits because petitioner has not established any entitlement to relief with respect
22   to his ineffective assistance of counsel claim.  *See* 28 U.S.C. § 2254(b)(2) ("an application for writ of habeas may be
     denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of
23   the State.")

REPORT AND RECOMMENDATION
PAGE - 15

4.      Claim G:  Admission of ER 404(b) Evidence

Petitioner asserts in his seventh ground for relief (Claim G) that he was denied a fair trial when the trial court improperly allowed the state to introduce irrelevant and prejudicial evidence of his past acts.  (Dkt. 3-1 at 47-52.)  Respondent argues that petitioner failed to properly exhaust this claim because he did not present the claim to the state courts as a federal constitutional violation.  (Dkt. 13 at 20.)  The record reflects that petitioner presented his claim regarding the alleged erroneous admission of ER 404(b) evidence to the state courts on direct appeal.  (*See* Dkt. 14, Ex. 3 at 6-19 and Ex. 9 at 6-11.)  However, though petitioner alleged in the state courts that admission of the challenged evidence deprived him of a fair trial, he did not identify any federal constitutional basis for his claim.  (*See id*.)  As noted above, general appeals to broad constitutional principles such as the right to a fair trial are insufficient to establish exhaustion.  *Hiivala*, 195 F.3d at 1106.  Because petitioner failed to present the claim to the state courts as one specifically alleging a federal constitutional violation, the claim has not been properly exhausted.

5.      Claim H:  Failure to Sever Charges

Petitioner asserts in his eighth ground for relief (Claim H) that the trial court's refusal to sever charges denied him a fundamentally fair trial in violation of his right to due process.  (Dkt. 3-1 at 53-56.)  Petitioner references in his claim the motion he filed in the trial court seeking to sever the thirteen charges filed against him into three clusters, and notes that the trial court denied the motion and subsequent renewals of the motion.  (*Id*. at 54.)  Petitioner also references in his claim the argument presented by his appellate counsel on direct appeal which focused primarily on the trial court's refusal to sever the communicating with a minor for immoral purposes (CMIP) charge from the remaining twelve charges.  (*Id*.)  The Court of Appeals refused to address the claim presented on appeal because petitioner sought narrower relief on appeal than he did before

REPORT AND RECOMMENDATION
PAGE - 16

1    the trial court.  (*Id.*)

2          It is not entirely clear whether petitioner intends to challenge in this federal habeas action

3    the trial court's denial of his motion to sever the charges into three clusters or the Court of Appeals'

4    refusal to consider his claim pertaining to severance of the CMIP charge.  Respondent construes

5    petitioner's claim as being comprised of two parts – the first part pertaining to the trial court's

6    denial of petitioner's motion to sever the charges into three clusters, and the second part pertaining

7    to the trial court's alleged misjoinder of the CMIP charge with the other twelve charges.  This

8    Court does not construe petitioner's improper joinder claim as presenting two sub-parts but, rather,

9    construes it as presenting only the claim that the trial court erred in refusing to sever the charges

10   into three clusters.[5]  That claim clearly has not been properly exhausted because that is not the

11   claim petitioner presented to the state courts on direct appeal.

12         6.      Claim J:  Lesser Included Offense Instructions

13         Petitioner asserts in his tenth ground for relief (Claim J) that the trial court's refusal to

14   instruct the jury on lesser included and lesser degree offenses violated his right to due process.

15   (Dkt. 3-1 at 59-65.)  Specifically, petitioner asserts that he was entitled to an instruction on

16   unlawful display of a weapon as a lesser included offense of the second degree assault charge, and

17   to an instruction on unlawful possession of a firearm in the second degree as a lesser included

18   offense of the unlawful possession of a firearm in the first degree charge.  (*See id.*)  Respondent

19   argues that petitioner failed to properly exhaust this claim because he did not present the claim as

20

21         [5] Even if the Court were to construe the claim as one arising out of the trial court's refusal to sever only the
     CMIP claim, that claim is likely not eligible for federal habeas review because the Washington Court of Appeals
22   declined to review the claim based on what appears to be an independent and adequate state procedural rule which
     means the claim has been procedurally defaulted.

23

REPORT AND RECOMMENDATION
PAGE - 17

a federal constitutional violation at every level of state court review nor did he present the factual bases for the claim at every level of state court review.  (Dkt. 13 at 20-21.)

The record reflects that petitioner first presented his jury instruction claim to the state courts in his *pro se* statement of additional grounds submitted to the Court of Appeals on direct review.  (*See* Dkt. 14, Ex. 4 at 16-24.)  Petitioner did not allege in his statement of additional grounds that the failure to instruct the jury on lesser included offenses violated his federal constitutional rights but, instead, presented his claim as solely an issue of state law.  (*Id*.)  In his subsequent petition for review to the Washington Supreme Court, petitioner's appellate counsel asserted a claim that the trial court erred in failing to give an instruction on unlawful display of a weapon as a lesser offense to the assault charge, and counsel specifically alleged that the failure to instruct on the lesser offense violated the Fourteenth Amendment.  (*See id*., Ex. 9 at 17-18.)

Because petitioner failed to first present his claim pertaining to the proposed instruction on unlawful display of a weapon to the Washington Court of Appeals as a Fourteenth Amendment violation before presenting it to the Washington Supreme Court as a federal constitutional claim, the claim has not been properly exhausted.  And, because petitioner failed to present his claim pertaining to the proposed instruction on unlawful possession of a firearm in the second degree to either the Court of Appeals or the Supreme Court as a federal constitutional claim that claim, likewise, has not been properly exhausted.

<u>Procedural Default</u>

As explained above, petitioner failed to properly exhaust claims D, G, H and J.  When a petitioner fails to exhaust his state court remedies and the court to which the petitioner would be required to present his claims in order to satisfy the exhaustion requirement would now find the claims to be procedurally barred, there is a procedural default for purposes of federal habeas

REPORT AND RECOMMENDATION
PAGE - 18

1    review.  *Coleman*, 501 U.S. at 735 n.1.  Respondent argues that petitioner, having failed to properly

2    exhaust the claims discussed above, would now be barred from presenting those claims to the state

3    courts under RCW 10.73.090.  (Dkt. 13 at 21.)  Respondent argues that petitioner would likely

4    face additional obstacles to returning to the state courts as well.  (*Id.*)

5        RCW 10.73.090(1) provides that a petition for collateral attack on a judgment and sentence

6    in a criminal case must be filed within one year after the judgment becomes final.  Petitioner's

7    judgment became final for purposes of state law on September 23, 2016, the date the Court of

8    Appeals issued its mandate terminating direct review.  *See* RCW 10.73.090(3)(b).  It therefore

9    appears clear that petitioner would now be time barred from returning to the state courts to present

10   his unexhausted claims.  *See* RCW 10.73.090.  In addition, because petitioner previously pursued

11   a collateral challenge in the state courts, the state courts are not likely to entertain another such

12   challenge from petitioner.  *See* RCW 10.73.140; RAP 16.4(d).  This Court therefore concludes that

13   petitioner has procedurally defaulted on claims D, G, H and J.

14       When a state prisoner defaults on his federal claims in state court, pursuant to an

15   independent and adequate state procedural rule, federal habeas review of the claims is barred

16   unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

17   alleged violation of federal law, or can demonstrate that failure to consider the claims will result

18   in a fundamental miscarriage of justice.  *Id.* at 750.  To satisfy the "cause" prong of the cause and

19   prejudice standard, a petitioner must show that some objective factor external to the defense

20   prevented him from complying with the state's procedural rule.  *Id.* at 753 (citing *Murray v.*

21   *Carrier*, 477 U.S. 478, 488 (1986)).  To show "prejudice," a petitioner "must shoulder the burden

22   of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they

23   worked to his *actual* and substantial disadvantage, infecting his entire trial with error of

REPORT AND RECOMMENDATION
PAGE - 19

constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause or prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent. *Murray*, 477 U.S. at 495-96.

Petitioner makes no effort to show cause or prejudice for his default. Petitioner does, however, argue with respect to the portion of Claim J pertaining to the failure to give a lesser included offense instruction in relation to the unlawful possession of a firearm charge, that he is actually innocent of the crime of unlawful possession of a firearm in the first degree. The miscarriage of justice exception, if established, functions as a "gateway" permitting a habeas petitioner to obtain review of claims of constitutional error that would otherwise be procedurally barred. *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997).

The Supreme Court has cautioned that tenable gateway actual innocence claims are rare. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is demanding and rarely met). In order to make a credible claim of actual innocence, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324.

Petitioner's claim of actual innocence is based on his assertion that the Unlawful Possession of a Firearm charge of which he was convicted was based on a predicate crime; *i.e.*,

REPORT AND RECOMMENDATION
PAGE - 20

second degree burglary, that is not a "crime of violence," and, thus, is not a "serious offense" as is required to support a guilty verdict for unlawful possession of a firearm in the *first-degree*. (Dkt. 3-1 at 65; Dkt. 18 at 21.) Petitioner offers no *new* evidence to support this claim, he merely raises a new legal argument which could have been, but was apparently not, presented to the trial court. Petitioner fails to satisfy the very demanding *Schlup* standard and his claim of actual innocence therefore fails. Based on the foregoing, petitioner's federal habeas petition should be denied with respect to claims D, G, H and J as those claims are unexhausted and procedurally barred.

<u>Standard of Review for Exhausted Claims</u>

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or (2) the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). In considering claims pursuant to § 2254(d), the Court is limited to the record before the state court that adjudicated the claim on the merits, and the petitioner carries the burden of proof. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).

Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id*. at 407-09.

REPORT AND RECOMMENDATION
PAGE - 21

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. This includes the Supreme Court's holdings, not its dicta. *Id.* "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

Under § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." "To show such an error occurred, the petitioner must establish that the state court's decision rested on a finding of fact that is '*objectively* unreasonable.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004)) (emphasis in original); *see also Lockyer*, 538 U.S. at 75. "Factual findings are objectively unreasonable if they are unsupported by sufficient evidence in the state court record." *Tong Xiong v. Felker*, 681 F.3d 1067, 1074 (9th Cir. 2012). In addition, the Court presumes the state court's factual findings to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

REPORT AND RECOMMENDATION
PAGE - 22

1        1.       <u>Claim A:  Violation of Right to Counsel</u>

2           Petitioner asserts in his first ground for federal habeas relief (Claim A) that his Fifth

3    Amendment rights were violated when police questioned him after he had invoked his right to

4    counsel.  (Dkt. 3-1 at 21-26.)  Petitioner claims, in particular, that at the time of his arrest he

5    provided the arresting officers with a form which specifically stated that "he demand[ed] all of his

6    rights at all times and did not waive any of his rights at any time."  (*See id*. at 23.)  Petitioner

7    maintains that a reasonable officer would have understood that the form was meant to invoke his

8    rights and that the officers at the scene of his arrest did, in fact, interpret the form in that fashion.

9    (*Id*.)  Petitioner complains that despite the fact that officers were under the impression he had

10   invoked his rights, they did not communicate that fact to Detective Stangeland who interrogated

11   petitioner at the police station several hours after his arrest.[6]  (*See id*.)

12          The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal

13   case to be a witness against himself."  U.S. Const. amend. V.  This privilege applies in the context

14   of custodial interrogations, *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), and is binding on the

15   states, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).  In *Miranda*, the Supreme Court held that a suspect

16   subject to custodial interrogation has the right to consult with an attorney and to have counsel

17   present during questioning."  *Miranda*, 384 U.S. at 469-71.

18          The right to counsel recognized in *Miranda* "require[es] the special protection of the

19   knowing and intelligent waiver standard."  *Edwards v. Arizona*, 451 U.S. 477, 483 (1981).  "If a

20

21           [6] Petitioner also asserts in his first ground for relief that, in addition to providing officers with the

22   document at the time of his arrest, he also made numerous requests for counsel at the scene of his arrest and while
     detained in the holding cell at the precinct.  (*See* Dkt. 3-1 at 24.)  To the extent this constitutes a separate claim for
     relief, the claim has not been properly exhausted because the record makes clear that petitioner did not present this

23   specific claim to the state courts.

REPORT AND RECOMMENDATION
PAGE - 23

suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." *Davis v. United States*, 512 U.S. 452, 458 (citing *North Carolina v. Butler*, 441 U.S. 369, 372-76 (1979)).  If, however, a suspect requests counsel at any time during questioning, "he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis*, 512 U.S. at 458 (citing *Edwards*, 451 U.S. at 484-85.)  A suspect who wishes to assert his right to counsel must "unambiguously request counsel." *Id.* at 459.  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel" officers are not required to cease questioning.  *See id.*

Petitioner argued on direct appeal that his right to counsel was violated when he was interrogated following his arrest after having unequivocally invoked his right to counsel by presenting the arresting officers a pre-printed form entitled "Notice to Arresting Officer with Miranda Warning."  (*See* Dkt. 14, Ex. 2 at 20 and Ex. 3 at 75-76; *see also* Ex. 5, Appendix.)  The Court of Appeals set forth the applicable standard, which is essentially the one described above, before proceeding to address the question before it; *i.e.*., whether, as a matter of law, it was reasonable for the police to conclude that petitioner had not invoked his rights.  The Court of Appeals explained its conclusion as follows:

> [W]hen Officer Willet detained Hurn, Hurn asked the officer to retrieve a document from his wallet.  The form document represented that Hurn was a "Civil Rights Investigator."  The form also advised the arresting officer holding the form that "[a]fter you have given your name, badge number, rank and proof of agency, *you* will have the right to remain silent."  (Emphasis added.)  The form also included nearly a full page of small font "demands," such as the demand that Hurn not be arrested unless the arresting officer personally witnessed the "arrestable act," that the officers carry an arrest warrant, that the officers refrain from taking his personal property, including his "personal photograph or fingerprints," that he be given "a

REPORT AND RECOMMENDATION
PAGE - 24

phone call forthwith to contact my outside counselor friend," and that the form be signed by the "sui juris Belligerent Claimant." In the background of Willet's in-car video recording, several of the officers can be heard discussing what the document meant.

Willet arrested Hurn. He advised Hurn that he was being audio recorded and then read him his <u>Miranda</u> rights. When police asked if he understood his rights, Hurn said, "yes," and was placed in Willet's patrol car. The officers did not substantively question Hurn at the scene.

Approximately 9 hours later, around 11:00 a.m., Detective Stangeland met with Hurn to attempt to obtain a statement from him. The detective again advised Hurn of his <u>Miranda</u> rights. Hurn said he understood his rights and spoke with Stangeland. Hurn made a number of inculpatory statements and eventually stated, "I want my attorney present during any kind of questioning with you."[7]

Following a suppression hearing, the trial court concluded that Hurn's form document did not unequivocally invoke his right to remain silent or his right to counsel. The court further concluded that Hurn was properly advised of and, initially, validly waived his rights.

Hurn argues that his form document contained an unequivocal invocation of his right to counsel. For this proposition, he relies on the erroneous assertion that "officers at the scene of the arrest" thought Hurn meant to invoke his right to counsel. He argues that the trial court's conclusion that the words on the form were ambiguous means that "the officers on the scene who understood this as an invocation were unreasonable." Br. of Appellant at 27. But there is no evidence that any of the officers believed that Hurn was invoking his right to *counsel*. Hurn seems to be referring to Officer Spaulding, who can be heard on the in-car video recording opining that Hurn's document was an attempt to invoke his right to *silence*. However, as Spaulding later testified, he did not actually read the document and relied on its title, which included the word "Miranda." Once the officer read the document in its entirety, he no longer believed that Hurn was attempting to invoke his right to silence. Indeed, Spaulding testified that Hurn never invoked either his right to silence or his right to counsel, even though the officers were discussing the meaning of his document within his hearing.

Hurn relies on <u>State v. Grieb</u>, 52 Wn. App. 573, 761 P.2d 970 (1988), for the proposition that the statement "does not waive any of his rights" is unambiguous. That case is easily distinguishable from this one. There, the suspect was advised of his <u>Miranda</u> rights and immediately and repeatedly stated, "I don't wanna waive my rights." <u>Grieb</u>, 52 Wn. App. at 573-74. In this case, Hurn

---

[7] [Court of Appeals footnote 10] There is no dispute on appeal that, with this statement, Hurn unequivocally invoked his right to counsel and that statements he made thereafter were properly suppressed.

REPORT AND RECOMMENDATION
PAGE - 25

1    presented his document to the police before any set of rights were discussed with
2    him.  Unlike in <u>Grieb</u>, therefore, Willet had no context from which to interpret the
     lengthy, small-font document that purported to demand "all his rights" but specified
3    only the "right to personal time and property."  Additionally, the document, while
     mentioning <u>Miranda</u>, does so only in the context of advising the arresting officer of
4    the *officer's* right to remain silent and to "have counsel present during any
     interrogation or civil disclosure."  Willet did not interpret this as an invocation of
5    Hurn's right to counsel.  Accordingly, he provided Hurn with the appropriate
     <u>Miranda</u> warnings, which Hurn stated he understood but did not invoke.

6           The purpose of Hurn's puzzling preprinted form was ambiguous.  As the
7    trial court properly concluded, Hurn did not unequivocally invoke his right to
     counsel by presenting it.

8    (Dkt. 14, Ex. 2 at 20-24.)

9    Petitioner claims that this decision of the Court of Appeals was contrary to clearly

10   established law and was based on an unreasonable determination of the facts.  (Dkt. 3-1 at 26.)  In

11   making this claim, petitioner relies heavily on material that was not presented to the state courts

12   and therefore is not properly before this Court.  The materials that are properly before this Court

13   amply demonstrate that the form upon which petitioner relies to support his claim that he invoked

14   his rights was indeed ambiguous.  Moreover, it is notable that after presenting his form to the

15   arresting officer, petitioner was twice advised by officers of his *Miranda* rights, once immediately

16   upon his arrest and once before he spoke to Detective Stangeland, and petitioner did not

17   immediately invoke his rights in response to either of those advisements.  (*See* Dkt. 14, Ex. 11 at

18   Ex. E.)  Petitioner only invoked his right to counsel part way through his interview with Detective

19   Stangeland.  (*See id*.)  Certainly, if petitioner was intent on invoking his rights, he had ample

20   opportunity to do so aside from what the Court of Appeals correctly characterized as the "puzzling

21   preprinted form" he handed to officers at the scene of his arrest.

22   The Court of Appeals applied the proper standard in evaluating petitioner's claim and

23   reasonably concluded, based on the evidence before it, that petitioner did not unequivocally invoke

REPORT AND RECOMMENDATION
PAGE - 26

1   his right to counsel by presenting the form to officers at the time of his arrest.  Petitioner's federal

2   habeas petition should be denied with respect to his first ground for relief (Claim A).

3          2.      Claims B and C:  *Brady* Violation/Destruction of Evidence

4          Petitioner asserts in his second ground for relief (Claim B) that his right to a fair trial was

5   violated when the state failed to disclose favorable impeachment evidence.  (*See* Dkt. 3-1 at 27-

6   31.)   At issue in Claim B is a Seattle Police Department ("SPD"), Office of Professional

7   Accountability ("OPA") investigation report regarding the alleged theft of petitioner's money by

8   arresting officers.  (*Id*. at 28.)  Petitioner contends that the officers provided testimony to OPA

9   investigators months before testifying at his trial, and that that testimony directly contradicted the

10  officers' testimony at petitioner's CrR 3.5 hearing.  (*Id*.)  Petitioner maintains that if defense

11  counsel had been provided a copy of the OPA report prior to trial, he would have been able to use

12  it to impeach the officers which, in turn, would have led to the suppression of all evidence garnered

13  from Detective Stangeland's post-arrest interrogation of petitioner.  (*Id*. at 28-30.)

14         Petitioner asserts in his third ground for relief (Claim C) that his right to due process and a

15  fair trial were violated when the state destroyed favorable evidence.  (*Id*. at 32-34.)  At issue in

16  Claim C is video from the SPD holding cell area which petitioner also claims would have

17  impeached officers' testimony at the CrR 3.5 hearing and would likely have led to the suppression

18  of statements petitioner made to Detective Stangeland.  (*Id*. at 33.)  Petitioner asserts that he made

19  timely discovery requests for the video, but the video was destroyed despite the fact that SPD

20  policy requires retention of holding cell video footage when a timely request is made.  (*Id*.)

21         The prosecution has a constitutional duty to disclose to an accused all evidence that is "both

22  favorable to the accused and 'material either to guilt or to punishment.'"  *United States v. Bagley*,

23  473 U.S. 667, 674 (1985) (citing *Brady v. Maryland*, 373 U.S. at 87).  The duty to disclose

REPORT AND RECOMMENDATION
PAGE - 27

encompasses both exculpatory evidence and impeachment evidence. *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *Bagley*, 473 U.S. at 676). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitely*, 514 U.S. 419, 433-34 (1995) (citing *Bagley*, 473 U.S. at 682). A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. *Id.* at 434 (citing *Bagley*, 473 U.S. at 678).

The Constitution also imposes on the states a duty to preserve evidence, but that duty is limited to "evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488. In order to meet this standard of constitutional materiality, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58.

The Washington Court of Appeals, on collateral review of petitioner's convictions, analyzed petitioner's claims regarding the OPA investigation report and the holding cell video together. The Court of Appeals rejected these claims, explaining its conclusion as follows:

> Hurn next contends that the State violated the requirements of due process and Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to provide surveillance video footage from the holding cell at the police precinct and results of an investigation conducted by the Seattle Police Department's Office of Professional Accountability (OPA). He claims that such evidence would have demonstrated that he asked to call an attorney at the police precinct and that the police officers interrogated him after he invoked the right to counsel.
>
> To establish a Brady violation, Hurn must demonstrate that the State suppressed evidence and that the defense could not have obtained the evidence

REPORT AND RECOMMENDATION
PAGE - 28

using reasonable diligence.  See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); State v. Thomas, 150 Wn.2d 821, 851, 83 P.3d 970 (2004).  Brady requires the State to disclose evidence that is favorable to the defense and material to guilt or punishment.  See In re Pers. Restraint of Benn, 134 Wn.2d 868, 916, 952 P.2d 116 (1998).  A violation of this obligation requires reversal when (1) evidence is favorable to the accused because it is either exculpatory or impeaching of a State witness, (2) the State intentionally or inadvertently suppressed the evidence, and (3) the accused was prejudiced as a result.  State v. Mullen, 171 Wn.2d 881, 895, 259 P.3d 158 (2011).  Prejudice occurs if there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different.  Benn, 134 Wn.2d at 916.  More particularly, the question is whether, in the absence of the suppressed evidence, the defendant nonetheless received a fair trial, meaning one resulting in a verdict worthy of confidence.  Id.

Hurn did not testify at the CrR 3.5 hearing.  Based on the testimony at the CrR 3.5 hearing, the trial court found that Hurn invoked his right to counsel during a police interview that took place approximately nine hours after his arrest.  The court excluded statements he made after he invoked this right.  On appeal, this court rejected Hurn's claim that he unequivocally invoked his right to counsel by presenting a preprinted "Notice to arresting officers" form to the arresting officer at the time of his arrest.  State v. Hurn, No. 71813-4.

Hurn maintains that he requested police precinct video surveillance footage from the State, but it was not provided.  In June 2013, a few months after his arrest, Hurn filed a claim with the OPA alleging that the police stole money that was in his possession at the time of his arrest.  Nevertheless, he claims that [he] did not obtain the OPA's report or transcripts of the interviews the OPA conducted in its investigation of his complaint until October 2016.

As the State points out, there is nothing in the record to support Hurn's claim that any holding cell video footage would have contained any material or favorable evidence.  Nor can Hurn establish that the State destroyed such evidence in bad faith, given the Department's policy that surveillance footage is retained for only 30 days.  Even assuming that Hurn requested video footage taken from the holding cell from the State within this 30-day period, he cannot meet his burden to establish that such evidence would have been favorable or material or that he was prejudiced.

And, contrary to Hurn's claim, the OPA interview transcripts he supplies do [sic] establish perjury nor do they support his claim that he requested counsel prior to Detective Stangeland's interview.

In her testimony at the CrR 3.5 hearing, Officer San Miguel said that when she arrived at the police precinct, she "walked in there to check to make sure everything was filled out correctly after he was arrested and brought into the holding cell."  Then she said that another officer showed her a U.S. Treasury check

REPORT AND RECOMMENDATION
PAGE - 29

that was on Hurn's person but was payable to someone else and Hurn spontaneously volunteered that he found the check. The officer said that she did not hear any other spontaneous statements and said that Hurn was not questioned in the holding cell.

During her OPD interview with regard to Hurn's theft claim asserted against the Department, the same officer was asked if she talked to Hurn "at any time." She responded:

> I, I talked to him at length about a couple of things. He was concerned about this paper that he had in his possession that had, I guess it was from an attorney of his, and it had like some sort of rights sort of thing that he was supposed to show people if he got arrested. So I talked to him about that for awhile. And I spoke to him about the charges against him, informed him what we would be booking him for and what that meant, and making sure he understood his Miranda Rights before he talked to us about anything. That's all I recall talking to him about.

The officer said this conversation occurred in conjunction with the processing of Hurn's property. The officer also described Hurn making a voluntary statement with regard to the check.

The purpose of the CrR 3.5 hearing was to elicit statements made by Hurn that the State intended to offer at trial. The officer's statements in the OPA interview do not materially contradict the CrR 3.5 testimony, nor do they support his assertion that he invoked his right to counsel after his arrest, but before he was questioned by Detective Stangeland. In sum, Hurn fails to satisfy his burden under Brady to show a reasonable probability that the result of the proceeding would have been different if the OPA investigation material or holding cell video footage had been disclosed by the State.

(Dkt. 14, Ex. 2 at 8-12.)

The Washington Supreme Court, in ruling on petitioner's motion for discretionary review, addressed only petitioner's claim concerning the video and did not address the issue of the OPA investigation material. The Supreme Court Commissioner concluded that the Court of Appeals properly dismissed the claim as frivolous because petitioner failed to identify any factual basis for the claim or any resulting prejudice. (*Id*., Ex. 16 at 7.) In particular, the Commissioner concluded that petitioner failed to establish the holding cell video "would have been either material or that

REPORT AND RECOMMENDATION
PAGE - 30

1    the State acted in bad faith in destroying it." (*Id.*)

2        This Court begins with petitioner's claim that the state violated his rights under *Brady* when

3    it failed to produce the OPA investigation material.  Because the Washington Supreme Court did

4    not expressly address this claim, this Court reviews the claim in light of the Court of Appeals'

5    decision rejecting it.  Petitioner contends that the Court of Appeals' decision was unreasonable

6    because, contrary to that court's ruling, he did not initiate the OPA investigation.  According to

7    petitioner, this undermines the suggestion that he should have known about the investigation and

8    should have had access to the OPA investigation materials earlier than he claimed to have received

9    them. (Dkt. 3-1 at 30-31.)  Regardless of who initiated the investigation, the record suggests that

10   petitioner's counsel had access to the OPA materials at the time of petitioner's CrR 3.5/3.6 hearing

11   because counsel referenced an OPA interview in his cross-examination of one of the officers who

12   testified at the hearing.  (*See* Dkt. 14, Ex. 19 at 149.)

13       Moreover, the Court of Appeals reasonably concluded, based on its review of the portions

14   of the OPA file submitted by petitioner in support of his personal restraint petition, that the

15   materials did not establish perjury nor did they support any claim that petitioner requested counsel

16   prior to being interviewed by Detective Stangeland.  Petitioner submitted with his personal

17   restraint petition only the opinion of the OPA director regarding the alleged misconduct that had

18   been investigated, and a transcript of the interview conducted by the OPA investigator with Officer

19   San Miguel. (*See* Dkt. 14, Ex. 11 at Exs. K and L.)  The Court of Appeals accurately summarized

20   Officer San Miguel's testimony at the CrR 3.5 hearing and her statement to the OPA investigator,

21   and reasonably determined that the officer's statements to OPA did not materially contradict her

22   in-court testimony.

23       With respect to petitioner's claim concerning the holding cell videos, petitioner argues that

REPORT AND RECOMMENDATION
PAGE - 31

1   the Washington Supreme Court's conclusion that he failed to establish the holding cell video

2   would have been material, or that the state acted in bad faith in destroying it, was contrary to the

3   facts in the record and disregards clearly established Supreme Court precedent. (Dkt. 3-1 at 33-

4   34.) According to petitioner, the video would have directly impeached the officers' testimony at

5   the CrR 3.5 hearing and would have likely led to the suppression of statements petitioner made to

6   Detective Stangeland after he claims he invoked his right to counsel. (*Id.*) Petitioner argues that

7   the OPA report is indicative of what the destroyed video would have shown; *i.e.*, that the officers

8   had substantially more interaction with petitioner than they testified to at the CrR 3.5 hearing and

9   would have supported his claim that he made a request for counsel while he was in the holding

10  cell. (*See id.*) Petitioner also argues that since the state, as a result of petitioner's discovery

11  requests, was on notice that the video evidence must be preserved, the destruction of that evidence

12  necessarily establishes bad faith. (*Id.*)

13        Essentially the only support petitioner offers for his contention that the video would have

14  been potentially useful to the defense are the allegedly withheld OPA investigation materials which

15  petitioner believes show the officers committed perjury when they testified at the CrR 3.5 hearing.

16  However, as explained above, the portions of the OPA file submitted by petitioner to the state

17  courts do not, in any way, support petitioner's claim that the officers testified falsely nor do they

18  give rise to any inference that the video would have aided the defense. Petitioner has not

19  established that the state courts' conclusions with respect to his *Brady* claim or his destruction of

20  the evidence claim were contrary to clearly established federal law nor has he demonstrated that

21  the decisions were based on an unreasonable determination of the facts in light of the evidence

22  presented. Petitioner's federal habeas petition should therefore be denied with respect to his

23  second and third grounds for relief (Claims B and C).

REPORT AND RECOMMENDATION
PAGE - 32

3.    <u>Claim E:  Ineffective Assistance of Counsel</u>

Petitioner asserts in his fifth ground for relief (Claim E) that he was denied his right to effective assistance of counsel when his attorney failed to move to suppress evidence derived from an unlawful search of petitioner's cell phone.  (Dkt. 3-1 at 38-43.)  At issue in this claim is the testimony of state's witness B.B. which petitioner contends was subject to exclusion under the "fruit of the poisonous tree" doctrine because the state learned of her identity as a result of the unlawful search of his phone.  (*Id*. at 39.)  While petitioner's counsel successfully moved pretrial to suppress evidence obtained from an unlawful forensic search of petitioner's cell phones, he did not move to exclude the testimony of B.B.  (*See id*.)

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668 (1984).  "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland*.  Under *Strickland*, a defendant must prove (1) that counsel's performance was deficient and, (2) that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.

With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's performance fell below an objective standard of reasonableness.  *Id*. at 688.  Judicial scrutiny of counsel's performance must be highly deferential.  *Id*. at 689.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id*.

REPORT AND RECOMMENDATION
PAGE - 33

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component. *Id*. at 697.

While the Supreme Court established in *Strickland* the legal principles that govern claims of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate whether defense counsel's performance fell below the *Strickland* standard. *Harrington*, 562 U.S. at 101. Rather, when considering an ineffective assistance of counsel claim on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id*. As the Supreme Court explained in *Harrington*, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id*.

The Court of Appeals, on collateral review of petitioner's convictions, rejected petitioner's claim that his trial counsel was constitutionally ineffective for failing to move to suppress the testimony of B.B. (*See* Dkt. 14, Ex. 14 at 5-8.) The Court of Appeals explained its conclusion as follows:

> Hurn's counsel filed a motion to suppress evidence. He argued that there was insufficient basis for the investigative stop and his subsequent arrest and challenged the sufficiency of the search warrants. Following an extensive combined CrR 3.5 and CrR 3.6 hearing, the court denied the motion, except with respect to the evidence obtained from the search of Hurn's cell phones. As to that issue, although the affidavit for the search warrant authorized a forensic search of the phones, the actual warrant did not. Thus, the State conceded, and the trial court concluded, that the evidence obtained from the search of the cell phones was inadmissible in the State's case in chief.

REPORT AND RECOMMENDATION
PAGE - 34

The exclusionary rule generally requires that the evidence obtained from an illegal search and seizure be suppressed.  State v. Gaines, 154 Wn.2d 711, 716-717, 116 P.3d 993 (2005).   Evidence derived from an illegal search may also be suppressed as fruit of the poisonous tree.  Gaines, 154 Wn.2d at 717, 116 P.3d 993; Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963).  However, the testimony of a witness whose identity is discovered through a constitutional violation is not typically subject to suppression; the free will of the witness attenuates any taint that led to the discovery of the witness.  State v. Hilton, 164 Wn. App. 81, 89-90, 261 P.3d 683 (2011); see also United States v. Ceccolini, 435 U.S. 268, 274-280, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (Fourth Amendment violation); Michigan v. Tucker, 417 U.S. 433, 449-452, 94 S.Ct. 2357, 41 L.Ed. 2d 182 (1974) (Fifth Amendment violation).

In addition, evidence tainted by unlawful police action is not subject to exclusion if it is obtained pursuant to a valid warrant or other lawful means independent of the unlawful action.  Gaines, 154 Wn.2d at 718; State v. Miles, 159 Wn. App. 282, 291-298, 244 P.3d 1030 (2011); Murray v. United States, 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S. Ct. 182, 64 L.Ed. 319 (1920).  Under this doctrine, an unlawful search does not invalidate a subsequent search if the subsequent search is based on untainted independently obtained information, and the State's decision to search is not motivated by the previous unlawful search and seizure.  See State v. Miles, 159 Wn. App. 282, 292-94, 244 P.3d 1030 (citing Murray, 487 U.S. at 542-43); see also Gaines, 154 Wn.2d at 718, 721.

Thus, even if counsel had raised the argument, B.B.'s testimony was not subject to suppression.  The record also shows that B.B.'s identity was obtained though [sic] untainted and independently obtained information.  Barnhardt told the detective that Hurn was accompanied by a teenager with brown hair named "Bridget."  In a search of Hurn's apartment, police found false identification cards bearing different names with a photograph of a young woman that the detective suspected was Bridget.  The detective prepared and disseminated a bulletin bearing the photograph.  In response, the detective received photographs of two individuals obtained from Seattle Public Schools.  The detective determined that one of the individuals, named "Bridget," was the person pictured on the fake identification cards and also learned that her address was close to Hurn's apartment.  After running Bridget's name through a police database, the detective learned that Bridget had been a witness in a prior case and obtained contact information for Bridget and her mother, and was able to contact B.B. using that information.

Although the detective also compared the photographs received following the bulletin with some photographs found on Hurn's cell phone, the photographs on the cell phone merely corroborated the detective's suspicion that the person depicted on the fake identification cards was the same person Barnhardt described.

REPORT AND RECOMMENDATION
PAGE - 35

1

2

3

4

5

> The unlawfully obtained photographs on Hurn's cell phone did not allow the detective to discover B.B.'s identity or locate her. Because Hurn fails to establish that the unlawful search of his cell phones required suppression of the witness's testimony, he cannot demonstrate that counsel was constitutionally inadequate failure [sic] to move to suppress on this basis. See State v. McFarland, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995) (in the context of the failure to bring a motion to suppress, counsel can only have been ineffective if it can be shown that the motion likely would have been granted).

6    (*Id.*)

7    The Washington Supreme Court Commissioner addressed the claim as well on petitioner's

8    motion for discretionary review and agreed that petitioner had not demonstrated that the

9    exclusionary rule applied in his case. (*Id.*, Ex. 16 at 5-7.) The Commissioner explained that the

10   Court of Appeals' holding that "the testimony of a witness whose identity is discovered through a

11   constitutional violation is not typically subject to suppression because the free will of the witness

12   attenuates any taint that led to the discovery of the witness," was consistent with Washington

13   Supreme Court precedent. (*Id.*, Ex. 16 at 5-6.) The Commissioner further explained that "[w]hen

14   the State presents the testimony of a cooperative witness, the fact that discovery of the witness was

15   the result of an unlawful search does not require exclusion of the witness's voluntary testimony."

16   (*Id.*, Ex. 16 at 6-7, citing *United States v. Ceccolini*, 435 U.S. at 276-77.)

17   Petitioner argues that the United States Supreme Court's decision in *Ceccolini* requires a

18   different result because, under the precedent established in that case, suppression of the witness

19   testimony in this case was required. The Supreme Court, in *Ceccolini*, rejected a *per se* rule that

20   live witness testimony is not subject to the exclusionary rule and identified factors a court should

21   consider in determining whether the exclusionary rule is properly applied in any given case.

22   *Ceccolini*, 435 U.S. at 274-78. Petitioner focuses his attention on one of the factors identified in

23   *Ceccolini* as relevant to consideration of whether the exclusionary rule should apply; *i.e.*, the

REPORT AND RECOMMENDATION
PAGE - 36

1    motive of the police in conducting the search at issue.  (Dkt. 3-1 at 42.)  Petitioner argues that in

2    his case the express purpose of the search of the cell phones was to find and identify B.B.  (*Id.*)

3    However, the police motive in conducting the search is only one factor relevant to a determination

4    of whether a victim's testimony should be suppressed and does not, by itself, mandate application

5    of the exclusionary rule as petitioner suggests.  *See Ceccolini*, 435 U.S. at 275-78.

6        Petitioner also fails to demonstrate that B.B.'s identity and location were, in fact,

7    discovered as a result of the unlawful search of his cell phone rather than through untainted and

8    independently obtained information as the Court of Appeals concluded.  In sum, nothing in the

9    record before this Court suggests that the testimony of B.B. would likely have been excluded had

10   petitioner's counsel moved for the suppression of such evidence.  Petitioner federal habeas petition

11   should therefore be denied with respect to petitioner's fifth ground for relief (Claim E).

12       4.    <u>Claim F:  Confrontation Clause</u>

13       Petitioner asserts in his sixth ground for relief (Claim F) that the trial court violated his

14   rights under the confrontation clause when it limited the cross-examination of prosecution witness

15   Karla Barnhardt.  (Dkt. 3-1 at 44-47.)  Defense counsel attempted to cross-examine Ms. Barnhardt

16   about instances where she had admittedly lied to police in the past, but the trial court precluded

17   counsel from doing so.  (*Id*. at 46.)  Petitioner claims that the defense should have been permitted

18   to cross-examine the witness on this topic because "the conviction hinged so heavily on her

19   credibility."  (*Id*.)

20       The Confrontation Clause of the Sixth Amendment secures for the criminal defendant the

21   right to cross-examine a witness against him in order to test the believability of the witness.  *Davis*

22   *v. Alaska*, 415 U.S. 308, 315-16 (1974).  As the Court recognized in *Davis*, "the exposure of a

23   witness' motivation in testifying is a proper and important function of the constitutionally

REPORT AND RECOMMENDATION
PAGE - 37

protected right of cross-examination." *Id*. at 316-17.  Nonetheless, the right to cross-examination is not without limits.  Trial courts have broad discretion to impose limits on cross-examination, based on evidentiary concerns such as those embodied in the Federal Rules of Evidence, including relevancy, harassment, prejudice, delay, duplicity, or confusion of the issues.  *Delaware v. Van Arsdall*, 475 U.S. at 679.  The Supreme Court has observed that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Id*. (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)) (emphasis in original).

The Supreme Court has also made clear that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless-error analysis." *Id*. at 684. Relevant factors to consider in the harmless error analysis include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Id*.

Petitioner presented his Confrontation Clause claim to the Court of Appeals on direct appeal in his *pro se* statement of additional grounds, and the court rejected the claim. The Court of Appeals identified the correct legal standard and concluded that petitioner had not established any violation of his Sixth Amendment rights because he was not prevented from attacking Ms. Barnhardt's credibility on cross-examination, he was merely prevented from inquiring into a single collateral matter which the trial court excluded consistent with ER 608.[8]  (Dkt. 14, Ex. 2 at 26-27.)

---

[8] ER 608(b) provides:

The record confirms that petitioner's counsel was given wide latitude in conducting his cross-examination of Ms. Barnhardt and that he was, indeed, permitted to attack Ms. Barnhardt's credibility. (*See* Dkt. 14, Ex. 23 at 924-47, 951-55.) The trial court simply precluded petitioner from cross-examining Ms. Barnhardt about a single prior instance of untruthfulness which involved a domestic violence incident and an admission by Ms. Barnhardt during a pretrial defense interview that she was not truthful about how that prior incident started. (*See id.*, Ex. 23 at 954.) The trial court exercised its discretion under ER 608 to exclude the evidence, explaining that the defense, in seeking admission of such a specific instance of misconduct, particularly one involving a domestic violence situation, was essentially "asking to conduct a trial within a trial, not only as to whether the underlying allegations were true or not, but as to whether the influence of domestic violence affected the witness's motivations, recitations." (*Id.*, Ex. 23 at 955.) The trial court, in declining to permit a "mini trial within a trial," concluded that the trial was "already complicated enough." (*Id.*)

The decision of the state courts with respect to petitioner's Confrontation Clause claim was consistent with clearly established federal law and was based on a reasonable determination of the facts. Petitioner identifies no clearly established federal law which would have required a different result. Petitioner's federal habeas petition should therefore be denied with respect to his sixth ground for relief (Claim F).

     5.     Claim I:  Sufficiency of the Evidence

---

**Specific Instances of Conduct.**  Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.  They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Petitioner asserts in his ninth ground for relief (Claim I) that the state presented insufficient evidence to prove that he committed the crime of second-degree assault.  (Dkt. 3-1 at 56-59.)  In particular, petitioner argues that the state failed to prove the necessary intent element of assault; *i.e.*, that he had the specific intent of causing Ms. Barnhardt fear that she would be injured.  (*See id*. at 57-58.)

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove beyond a reasonable doubt each element of the charged offense.  *Carella v. California*, 491 U.S. 263, 265 (1989) (citing *In re: Winship*, 397 U.S. 358, 364 (1970)).  Due process claims challenging the sufficiency of the evidence are evaluated under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979).  The Supreme Court explained in *Jackson* that the relevant question in evaluating a claim of insufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*. at 319.  This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16.

It is the responsibility of the trier of fact, and not a reviewing court, to decide what conclusions should be drawn from the evidence admitted at trial.  *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). The Supreme Court has made clear that a reviewing court must be mindful of "the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296-97 (1992).  In *West*, the Court emphasized the deference owed to the trier of fact:

> We said [in *Jackson*] that "*all of the evidence* is to be considered in the light most favorable to the prosecution" . . . that the prosecution need not affirmatively "rule out every hypothesis except that of guilt" . . . and that a reviewing court "faced with

REPORT AND RECOMMENDATION
PAGE - 40

1
2

a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

3
4

*West*, 505 U.S. at 296-97 (quoting *Jackson*, 443 U.S. at 326) (citations omitted, emphasis in original).

5
6
7
8
9
10

The Supreme Court has also made clear that sufficiency of the evidence claims are subject to a second layer of judicial deference on federal habeas review. Specifically, the Supreme Court has held that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos*, 565 U.S. at 2).

11
12
13
14
15
16

The Washington Court of Appeals rejected petitioner's sufficiency of the evidence claim on direct appeal. The court began by setting out the standard applicable to sufficiency of the evidence claims, a standard consistent with that set forth by this Court above. The Court of Appeals then went on to explain its conclusion, in relation to that standard, that the evidence was sufficient to support petitioner's second-degree assault conviction:

17
18
19
20

To convict Hurn of second degree assault, the State was required to prove that he assaulted Barnhardt with a deadly weapon. RCW 9A.36.021(1)(c). "Assault" was defined for the jury as "an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." Jury Instruction 12; <u>accord</u> 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 35.50 (3d ed. 2008) (WPIC).

21
22
23

Hurn argues that the evidence did not establish that he intended to put Barnhardt in apprehension of harm because he did not point the gun directly at her and because Barnhardt testified she thought Hurn fired the weapon to "show off." Br. of Appellant at 25. In fact, however, Barnhardt testified that "he pulled the gun kind of maybe to show off in front of the little girl, . . . that he meant business

REPORT AND RECOMMENDATION
PAGE - 41

1    and . . . he was just somebody that people don't fuck with *or to scare me*."
2    (Emphasis added.)  She also testified that while Hurn did not point the gun at her,
     "he made sure it was clear that I saw that he had the gun."

3           And the evidence demonstrated that Barnhardt was scared.  Barnhardt
     testified that she was terrified and began crying and screaming when Hurn pulled
4    out the gun.  Hurn ordered her out of the car and warned her that "he had rounds in
     the gun and he's not fucking around."  When he fired the gun, it was only two feet
5    from Barnhardt's head.  Even though he had shot out of the sunroof and not directly
     at her, Barnhardt was afraid to turn her back on him because she believed he might
6    shoot her in the back.  Moreover, corroborating Barnhardt's testimony that she was
     afraid, Richard McKinney, who called 911, testified that he heard uncontrollable
7    sobbing after the gunshot.  Furthermore, Officer San Miguel testified that, when
     she encountered Barnhardt minutes later, Barnhardt was upset and "possibly in
8    shock."  Viewed in the light most favorable to the State, this evidence is sufficient
     to support the inference that Hurn intended to, and did in fact, place Barnhardt in
9    apprehension of harm.

10   (Dkt. 14, Ex. 2 at 17-20.)

11         This Court has reviewed the trial transcript and the remainder of the state court record

12   submitted by the parties.  The record shows that the Washington Court of Appeals applied the

13   correct standard in evaluating petitioner's sufficiency of the evidence claim.  According deference

14   to the Court of Appeals' resolution of the claim in relation to the evidence presented at trial, this

15   Court must conclude that the state court reasonably rejected petitioner's challenge to the

16   sufficiency of the evidence as there was, indeed, sufficient evidence in the record to support the

17   inference that petitioner intended to place Ms. Barnhardt in apprehension of harm and, thus,

18   sufficient evidence to support petitioner's conviction for second-degree assault.  Petitioner's

19   federal habeas petition should therefore be denied with respect to his ninth ground for relief (Claim

20   I).

21                          Petitioner's Motion to Expand the Record

22         Petitioner submitted in conjunction with his response to respondent's answer a motion to

23   expand the record before this Court to include all of the exhibits petitioner attached to his response.

REPORT AND RECOMMENDATION
PAGE - 42

1    (Dkt. 17.)  Petitioner's exhibits include: (1) a "Notice to Arresting Officers;" (2) OPA Complaint

2    # IS 13-0193; and (3) OPA Complaint # SA 13-0193.  (*See* Dkt. 20.)  Petitioner also requests that

3    respondent be directed to produce all of the clerk's papers designated by the parties and made a

4    part of the record on appeal so that this Court has a complete record before it for purposes of

5    adjudication of petitioner's federal habeas petition.  (*See* Dkts. 17, 20.)  Respondent opposes

6    petitioner's motion to the extent petitioner seeks to admit records that were never presented to the

7    state courts which, according to respondent, includes most of the documents attached to

8    petitioner's response.  (Dkt. 19.)

9          As noted above, in considering a federal habeas petition, this Court's review "is limited to

10   the record that was before the state court that adjudicated the claim on the merits."  *Cullen*, 563

11   U.S. at 181.  Petitioner's "Notice to Arresting Officers" (Exhibit 1), was a part of the record before

12   the state courts and is therefore properly before this Court on federal habeas review.  As to the files

13   of petitioner's two OPA complaints (Exhibits 2 and 3), only those portions of the OPA files

14   previously presented to the state courts may be considered by this Court on federal habeas review.

15   Petitioner presented portions of the OPA files to the state courts in his personal restraint

16   proceedings and those documents are already a part of the record before this Court as they were

17   submitted by respondent in conjunction with his answer to petitioner's petition.  (*See* Dkt. 14, Exs.

18   11, 13.)  Petitioner's request to expand the record to include the remainder of the OPA files should

19   be denied.  To the extent petitioner seeks to expand the record to include the clerk's papers, his

20   request should also be denied as he fails to explain how any of the clerk's papers are relevant to

21   this Court's disposition of his federal habeas claims.

22                              Certificate of Appealability

23         A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

REPORT AND RECOMMENDATION
PAGE - 43

dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his petition.

## CONCLUSION

Based on the foregoing, this Court recommends that petitioner's petition for writ of habeas corpus and his motion to expand the record be denied, and that this action be dismissed with prejudice. This Court also recommends that a certificate of appealability be denied with respect to all claims asserted in this federal habeas action. A proposed order accompanies this Report and Recommendation.

## OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be

REPORT AND RECOMMENDATION
PAGE - 44

ready for consideration by the District Judge on **February 19, 2021**.

DATED this 25th day of January, 2021.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 45